UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KRISTA S.,[1]

                          Plaintiff,                    DECISION AND ORDER

-vs-                                                        6:20-CV-6705 (CJS)

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

_____

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Both parties have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Pl.'s Mot., Aug. 2, 2021, ECF No. 18; Def.'s Mot., Oct. 5, 2021, ECF No. 21. Plaintiff argues that the Administrative Law Judge failed to properly consider whether Plaintiff met listing § 1.04(A) for a cervical spine impairment, improperly assessed the opinion evidence, and failed to properly evaluate Plaintiff's symptoms. Pl. Mem. of Law, Aug. 2, 2021, ECF No. 18-2. The Commissioner disputes Plaintiff's contentions. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings [ECF No. 18] is denied, the Commissioner's motion [ECF No. 21] is granted, and the Clerk of Court is respectfully directed to close the case.

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

PROCEDURAL HISTORY

The Court assumes the reader's familiarity with the facts and procedural history in this case, and therefore addresses only those facts and issues which bear directly on the resolution of the motions presently before the Court.

Plaintiff's Application and the Hearing Before the ALJ

Plaintiff's DIB and SSI applications were completed in January 2017, alleging a disability onset date of June 26, 2016. Transcript ("Tr.")[2], 187, Mar. 4, 2021, ECF Nos. 9-1 to 9-16. In her application, Plaintiff alleged that her ability to work was limited by the following: degenerative disk disease, spinal stenosis, osteoarthritis, hyperlipidemia, tobacco abuse, chronic depression, GERD, hereditary hemochromatosis, anxiety, vitamin D deficiency, and alcohol abuse. Tr. 214. On February 24, 2017, the Commissioner notified Plaintiff of the Commissioner's initial determination that Plaintiff was not disabled and therefore did not qualify for DIB or SSI benefits. Tr. 100. Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 136.

Plaintiff's request was approved, and the hearing was held in Rochester, New York on June 12, 2019. Tr. 56. Plaintiff appeared with counsel, and an impartial vocational expert ("VE") joined by phone. Tr. 58–99. Plaintiff's counsel made the following opening statement:

> Your Honor, disability in this case is based upon both physical and mental impairments. Physically, she has cervical issues, underwent fusion in September 2017, and has continued to have problems.
>
> In addition to that, her low back has also been an issue but really hasn't

---

[2] The administrative transcript for this matter was filed in 16 parts. Nevertheless, prior to filing the Commissioner inserted continuous pagination. Thus, rather than referring to the transcript volume number, this Court will refer to the Commissioner's pagination. For example, "187" rather than "ECF No. 9-6 at 2."

gotten attention yet, due to the neck issues.

She's also had ongoing mental health problems, somewhat complicated by issues of alcohol use . . . but nevertheless, she has been in treatment for that.

And it's our position that she's disabled, unable to perform any work at any exertional level given the combination. And not only that . . . if we were to take the cervical issues alone, based upon the treating doctor's assessments, she would be unable to perform even sedentary work.

Tr. 62.

With respect to her work history and education, Plaintiff testified that she had her GED, and discussed three jobs that she had held. Tr. 63–64. Plaintiff stated that she worked as a child specialist helping autistic boys with their activities of daily living with the Mary Cariola Children's Center in 2006, held a similar position with Catholic Charities in 2008, and after that worked as a machine operator for a couple of different manufacturing companies. Tr. 64–66. Plaintiff tried to work in September 2016 putting pieces of sanitized paper into a test tube to be sent out for testing, but only made it a month because she had to be on her feet looking down the whole time. Tr. 85. When asked what prevents her from working currently, she explained:

Pain . . . I can't sit for too long. I can't stand for too long. I get uncomfortable. I get parts that will start to tingle and go numb. Basically pain.

* * *

It began . . . in my neck area, and now it's my entire back.

Tr. 67. On a scale of 1 to 10, Plaintiff rated her constant neck pain as a "4 or 5," she has pain that radiates to her arms at a baseline of "3" when she is seated, and she has lower back pain that she rates as "5-6" and that radiates into her legs. Tr. 67–69. In addition, she said that her shoulder periodically gives her trouble, sometimes even up to a "7-8" in

3

pain and limited mobility. Tr. 69.

When asked to describe her mental health conditions, Plaintiff testified that she has daily "[d]ebilitating anxiety to the point where sometimes [she] can't even leave [her] house, [or] answer [her] phone." Tr. 73. She stated that 10 to 15 times per year she has panic attacks that last up to an hour, and during which her heart races, she sweats, and she stutters. Tr. 73–74. Plaintiff also said she experiences bouts of depression during which she is lethargic, gets insomnia, doesn't eat, doesn't shower, and experiences nightmares and flashbacks. Tr. 74. She is not on any medication for her mental conditions. Tr. 75.

With respect to her functionality, Plaintiff testified that her memory is "[a]wful," she is easily distracted and can't read a book, she has trouble making decisions, and has "moments" in which she can't go to crowded or public places. Tr. 77–78. She lives on her own and is able to climb up to three flights of stairs, can shower using her left hand, can cook simple meals, does "a lot of light house cleaning" such as sweeping and mopping, and does her own laundry, but she has to take breaks and she can only go grocery shopping with friends. Tr. 82–83. She gets "a lot more stiff, achy," in cold, damp weather, and her range of motion decreases. Tr. 87. She drinks alcohol periodically but realizes it makes her mental impairments worse, and she smokes a pack of cigarettes and some marijuana daily. Tr. 78, 89.

The ALJ's Decision

On July 31, 2019, the ALJ issued a decision finding that Plaintiff did not have a disability[3] under the law, and denying Plaintiff's claim for DIB and SSI benefits. Tr. 49. At the outset, the ALJ found that Plaintiff only met the requirements for special insured status[4] for DIB benefits through December 31, 2016. Tr. 22. At step one of the Commissioner's "five-step, sequential evaluation process,"[5] the ALJ found that Plaintiff has not engaged in substantial gainful activity since July 26, 2016. Tr. 23. At step two, the ALJ determined that Plaintiff has the following severe impairments: cervical spine degenerative disc disease; right shoulder disorder; alcohol abuse; depression; anxiety disorder; post-traumatic stress disorder; borderline personality disorder; and cannabis abuse. Tr. 23. In addition, he found that Plaintiff's medically determinable impairments of dysphagia, bilateral carpal tunnel syndrome, status-post release, and bilateral de Quervain's tenosynovitis were non-severe. Tr. 23.

---

[3] As relevant here, pursuant to 42 U.S.C. § 423(d)(1)(A), a "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."

[4] "Insurability is a prerequisite to receipt of [DIB] benefits but not to receipt of SSI benefits." *Henley v. Commissioner of Social Security*, 58 F.3d 210, 213 n. 4 (6th Cir. 1995). The Commissioner has four different rules for determining if a claimant is insured for purposes of becoming entitled to DIB benefits. *See* 42 U.S.C. 423(c); 20 C.F.R. § 404.130. "Just as an insurance policy would lapse after the policy owner ceases to pay the premiums, the same is true for" DIB claimants who fail to satisfy at least one of those rules and are not "fully insured" under the regulations. *Belcher v. Apfel*, 56 F. Supp.2d 662, 667 (S.D.W. Va. 1999).

[5] The Social Security Administration has outlined a "five-step, sequential evaluation process" that an ALJ must follow to determine whether a claimant has a "disability" under the law:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

At step three, the ALJ then assessed whether Plaintiff's impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. With respect to Plaintiff's physical impairments, the ALJ found the medical evidence showed that Plaintiff's impairments did not meet or medically equal the criteria for three particular listings: § 1.02 concerning major dysfunction of a joint, § 1.04 concerning spinal disorders, and § 11.14 concerning peripheral neuropathy. Tr. 25. With respect to Plaintiff's mental impairments, the ALJ applied the Commissioner's "special technique"[6] required by 20 C.F.R. § 404.1520a and § 416.920a, and found that the impairments did not meet or medically equal the criteria of listings § 12.04, § 12.06, § 12.08, or § 12.15. Tr. 25. The ALJ found that Plaintiff has a mild limitation in the area of understanding, remembering or applying information, and moderate limitations in the areas of interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. Tr. 25–27.

Then, before proceeding to step four, the ALJ carefully considered the entire

---

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. § 404.1520(a)(4)(i)–(v), § 416.920(a)(4)(i)–(v)). The claimant bears the burden of proof for the first four steps of the process. 42 U.S.C. § 423(d)(5)(A); *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). At step five, the burden shifts to the Commissioner only to demonstrate that there is other work in the national economy that the claimant can perform. *Poupore v. Asture*, 566 F.3d 303, 306 (2d Cir. 2009).

[6] The listings of specific mental impairments in 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00 ("App'x 1 § 12.00") provide the ALJ with detailed guidance for application of the "special technique." Generally, a claimant must satisfy at least two classes of criteria to justify a finding of a mental disorder. "Paragraph A" criteria include the "the medical criteria that must be present in [a claimant's] medical evidence" to indicate a particular disorder (e.g., the mental disorder of "schizophrenia" requires that the evidence include medical documentation of hallucinations or another similar symptom). App'x 1 § 12.00A(2)(a). "Paragraph B" criteria are four broad areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. App'x 1 § 12.00A(2)(b). A claimant must show an "extreme" limitation of one, or "marked" limitation of two, of the Paragraph B criteria. "Paragraph C" criteria are used to evaluate whether a claimant has a "serious and persistent" mental disorder.

record and determined that Plaintiff had the residual functional capacity[7] ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and § 416.967(a) except as follows:

> [S]he can lift and carry 10 lbs. occasionally, and less than 10 lbs. frequently as well as sit for 6 hours and stand or walk for 2 hours of an 8-hour day. [Plaintiff] can occasionally push and pull and reach overhead with her bilateral upper extremities. She can occasionally push and pull with her right lower extremity . . . . can frequently handle and finger bilaterally . . . . cannot climb ladders, ropes, or scaffolding . . . . can occasionally kneel, stoop, balance, crouch, crawl, and climb stairs and ramps. She must avoid concentrated exposure to unprotected heights and dangerous machinery. She can perform simple, routine, and repetitive tasks over an 8-hour workday with a normal break schedule. She can make simple work-related decisions. The claimant can occasionally interact with supervisors, the public and co-workers. The claimant can tolerate simple, routine changes in a work setting.

Tr. 27–28.

Consequently, at step four, the ALJ concluded that Plaintiff could not perform her past relevant work. However, based on the RFC, on Plaintiff's age and education, and on the testimony of the impartial VE, the ALJ found at step five that there were sufficient numbers of jobs in the national economy such as small parts assembler, hand packager, and solderer that Plaintiff could perform, even when those numbers were appropriately reduced to those that can be performed at the sedentary level. Tr. 48. Hence, the ALJ concluded that Plaintiff *is not* disabled for the purposes of DIB and SSI benefits. Tr. 49.

Plaintiff sought review of the ALJ's decision by the Commissioner's Appeals Council, but review was denied on June 24, 2020. Tr. 1. The ALJ's decision thus became the "final decision" of the Commissioner.

---

[7] "Residual functional capacity" ("RFC") means the most that the claimant can still do in a work setting despite the limitations caused by the claimant's impairments. 20 C.F.R. § 404.1545, § 416.945.

LEGAL STANDARD

42 U.S.C. § 405(g) defines the process and scope of judicial review of the final decision of the Commissioner on whether a claimant has a disability that would entitle him or her to an award of benefits. *See also* 42 U.S.C. § 1383(c)(3). "The entire thrust of judicial review under the disability benefits law is to ensure a just and rational result between the government and a claimant, without substituting a court's judgment for that of the [Commissioner], and to reverse an administrative determination only when it does not rest on adequate findings sustained by evidence having rational probative force." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (internal citation and quotation marks omitted).

Therefore, it is not the reviewing court's function to determine *de novo* whether the claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012). Rather, "[t]he threshold question is whether the claimant received a full and fair hearing." *Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018). Then, the reviewing court must determine "whether the Commissioner applied the correct legal standard[s]." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). Provided the claimant received a full and fair hearing, and the correct legal standards are applied, the court's review is deferential: a finding by the Commissioner is "conclusive" if it is supported by "substantial evidence." 42 U.S.C. § 405(g).

"Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quotation omitted). Consequently, once an ALJ finds facts, a reviewing court can reject those facts "only if a reasonable factfinder

would have to conclude otherwise." *Brault*, 683 F.3d at 448 (citation omitted).

## DISCUSSION

In the present case, as indicated above, Plaintiff raises three principal arguments for review by the Court. First, Plaintiff maintains that the ALJ failed to properly consider whether Plaintiff met listing § 1.04(A) relating to the cervical spine. Pl. Mem. at 20–23. Second, Plaintiff argues that the ALJ improperly assessed the opinion evidence and arrived at an improper RFC. Pl. Mem. at 23–33. Third, Plaintiff argues that the ALJ failed to properly assess her symptoms. Pl. Mem. at 33–35.

The Listing for § 1.04(A) and Plaintiff's Cervical Spine

*Legal Principles*

At step three of the Commissioner's five-step evaluation process, the ALJ must consider "whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments" in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix"). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Solis v. Berryhill*, 692 F. App'x 46, 48 (2d Cir. 2017) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)) (internal quotation marks omitted; emphasis in original). It is plaintiff's burden to "demonstrate that [her] disability [meets] all of the specified medical criteria of [a Listing]." *Tanya S.* v. *Comm'r of Soc. Sec.*, No. 1:20-CV-0972, 2021 WL 2268853, at *3 (W.D.N.Y. June 3, 2021) (citing *Otts v. Comm'r of Soc. Sec.*, 249 F. App'x. 887, 888 (2d Cir. 2007)). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530.

The section in the Appendix that addresses the musculoskeletal system no longer has a Listing § 1.04(A) for spinal disorders. However, at the time of the ALJ's decision, Listing § 1.04(A) required:

> [I]n addition to a spinal disorder such as a herniated disc, arthritis, degenerative disc disease, or a vertebral fracture – [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss . . . ."

*Scully v. Berryhill*, 282 F. Supp.3d 628, 635 (S.D.N.Y. 2017) (citing Listing § 1.04(A)). *See also Beers v. Comm'r of Soc. Sec.*, 449 F. Supp.3d 96, 102 (W.D.N.Y. 2020).

*Application*

In the present case, the ALJ stated that he considered this section of the listings, but that "the medical evidence of record does not substantiate that the claimant has limitation of motion of the spine, motor loss (atrophy with associated weakness or muscle weakness) accompanied by sensory or reflex loss, positive straight-leg raising test (sitting and supine), as well as spinal stenosis . . . ." Tr. 25. Plaintiff maintains that there is evidence of the existence of each requirement, and thus that the ALJ's decision in this regard should be reversed because the ALJ was required to explain which elements were missing, and whether he considered only the low back, the neck or both. Pl. Mem. at 22–23. The Commissioner disagrees, stating that the ALJ's decision should be affirmed because "Plaintiff has identified no more than 'sporadic findings' regarding Listing § 1.04A . . . ." Def. Mem. of Law, 18, Oct. 5, 2021, ECF No. 21-1.

The Court agrees with the Commissioner. Although the ALJ did not provide a thorough analysis at step three, the ALJ did not commit reversible error because his determination with respect to Plaintiff's motor loss accompanied by sensory or reflex loss

is supported elsewhere in his opinion.[8] *See Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982). In particular, the ALJ noted that in a follow-up appointment after her cervical fusion of C4–C7 in September 2017, Plaintiff "reported resolution of radicular arm pain and normal strength, sensations and reflexes . . . ." Tr. at 41, 555–562. The ALJ acknowledged that at an examination in May 2018, Plaintiff reported ongoing pain between her shoulder blades and that range of motion of the neck was mildly decreased to the right, and moderately decreased to the left, but observed that she showed normal strength, sensation, and reflexes. Tr. 42, 639–640. The ALJ also pointed to exams in October 2018 and January 2019 in which, despite complaints of pain, Plaintiff "could bend and touch her knees, exhibited a reciprocal gain, and was able to heel and toe walk . . . . [and] [s]traight leg raising was negative . . . ." Tr. 42, 728–734. In sum, the Court finds that the ALJ has adequately supported his conclusion that Plaintiff failed to substantiate that she experienced "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss . . . ."

The ALJ's Evaluation of Medical Opinions in the Record

Plaintiff also maintains that the ALJ erred by failing to give good reasons for discounting the respective medical opinion of her treating sources: Dr. Capicotto, Plaintiff's orthopedic surgeon; Dr. Pastor, Plaintiff's primary care physician; and Nurse Practitioner (NP) Hann and Licensed Clinical Social Worker ("LCSW") Vitale, Plaintiff's mental health counselors. Pl. Mem. of Law at 23–33. Additionally, Plaintiff argues the ALJ

---

[8] The ALJ's conclusion with respect to Plaintiff's loss of range of motion in her spine is not clear. However, that issue is not determinative here because the ALJ's conclusion regarding the absence of one of the other elements of Listing § 1.04(A) is clear – i.e., motor loss accompanied by sensory or reflex loss – and the Supreme Court has explained that *all* of the elements of a listing must be satisfied. *See Sullivan*, 493 U.S. at 531.

accorded too much weight to the medical and psychological consultative examiners, Dr. Figueroa and Dr. Brownfield. *Id.* The Commissioner counters that the ALJ did not err, but "carefully and thoughtfully discussed each of the medical opinions and only accepted so much of each opinion as was consistent with the medical evidence overall." Def. Mem. of Law at 15 (citation omitted).

*Dr. Peter Capicotto*

The ALJ evaluated at least four different opinions offered by Plaintiff's orthopedic surgeon, Dr. Peter Capicotto, and gave each opinion "little weight." Tr. 44–45. In the first opinion, a medical opinion for employability completed in January 2017, Dr. Capicotto assessed Plaintiff as "severely limited" in her ability to walk, stand, sit, lift/carry, push/pull, bend/squat, and climb stairs. Tr. 692. He indicated that Plaintiff was not physically able to maintain employment, and indicated that he would determine whether Plaintiff was capable of returning to employment at their next appointment in May 2017. Tr. 692. The ALJ gave this opinion "little weight" because "the excessive limitations . . . were not supported by the longitudinal record, including physical and neurological examination findings and the [Plaintiff]'s reported activities of daily living." Tr. 44.

Dr. Capicotto's second opinion was from May 2017, when he completed a medical examination for employability for the New York State Department of Social Services. Tr. 533–34. Dr. Capicotto indicated that Plaintiff was not physically/mentally able to maintain employment and not able in any capacity to walk, stand, sit, lift/carry, push/pull, bend/squat, see, hear, speak, use her hands, climb stairs, or use public transportation. Tr. 534. In the margins, however, Dr. Capicotto also indicates that Plaintiff could walk for 10 minutes, stand for 1 hour, sit for 15 minutes, and lift/carry and push/pull 10-15 pounds.

12

Tr. 534. He described Plaintiff's prognosis as "guarded," and anticipated that the date that Plaintiff would be able to participate in employment was "6 – 12 month if possible surgery." Tr. 534. The ALJ gave this opinion "little weight" because "it is internally inconsistent and addresses the ultimate issue [of disability] reserved to the Commissioner." Tr. 44.

In June 2017, Dr. Capicotto completed a cervical spine work limitations evaluation in which he diagnosed cervical stenosis and described Plaintiff's prognosis as "guarded." Tr. 663. Dr. Capicotto indicated that Plaintiff's distraction due to pain would be constant, and that she could not lift any more than 10 pounds. Tr. 664. He stated that Plaintiff could rarely (1% to 5% of the time) look down, occasionally (6% to 33% of the time) turn her head right or left, and never look up. Tr. 665. He estimated she would need to be absent more than 4 days each month. Tr. 665. The ALJ gave this opinion little weight on the basis that "the excessive limitations contained therein are not supported by the longitudinal record, including physical and neurological examination findings and [Plaintiff]'s reported activities of daily living." Tr. 45.

In September of 2018, Dr. Capicotto completed an "RFC Evaluation Review and Update" due to a change in Plaintiff's limitations as Dr. Capicotto described them in his June 2017 cervical spine work limitations evaluation. Tr. 662–666. Two particular changes included an increase in the weight that Plaintiff can lift and carry from less than 10 pounds to 11–20 pounds (Tr. 664), and an increase in the frequency with which Plaintiff can look down and look up from rarely or never to occasionally (6%–33% of the time). Tr. 665. Dr. Capicotto also revised downward his estimate of the number of days Plaintiff would likely be absent from work from more than 4 days per month to about one day per month. Tr. 665. The ALJ again gave the opinion "little weight" because it was not

supported by the longitudinal record, exam findings, or Plaintiff's reported activities of daily living. Tr. 46.

### Dr. Thomas Pastor

In February 2015, Dr. Thomas Pastor, Plaintiff's primary care physician, completed an "Evaluation of Physical Work Limitations" on Plaintiff's behalf. Tr. 743–46. Dr. Pastor diagnosed Plaintiff as having, among other things, cervical spinal stenosis and degenerative disc disease, and described Plaintiff's prognosis as fair. Tr. 743. Dr. Pastor indicated that Plaintiff could stand for a total of 3 hours during an 8-hour day, walk for a total of 4 hours, and sit for a total of 2 hours, with no more than 20 or 30 minutes of continuous sitting, standing, or walking. Tr. 744. He also indicated that Plaintiff could not lift and carry any more than 10 pounds, and that her condition would likely cause her to be absent from work more than 4 days per month and that she could only work two hours per day. Tr. 744–45. The ALJ gave Dr. Pastor's opinion little weight because "the excessive limitations contained therein are not supported by the longitudinal record, including physical and neurological examination findings and [Plaintiff]'s reported activities of daily living." Tr. 46. The ALJ also noted that "the medical evidence of record reflects improvement following cervical spine surgery." Tr. 46.

### NP Hann and LCSW Vitale

Plaintiff's mental health counselors, NP Hann and LCSW Vitale, began seeing Plaintiff in May 2017. Tr. 658. In September 2018, they completed an "Evaluation of Mental Work Limitations" in which they diagnosed Plaintiff with post-traumatic stress disorder, major depressive disorder, and borderline personality disorder, and indicated

that these disorders have lasted for or are expected to last for at least 12 consecutive months. Tr. 658. They also estimated that Plaintiff's ability to understand and remember would be limited 25% or more of the time (Tr. 656), her ability to work with others would be limited up to 25% of the time (Tr. 657), her ability to maintain regular attendance and be punctual would be limited between 11% and 25% of the time (Tr. 657), and her capacity to tolerate work pressures would be limited between 11% and 25% of the time (Tr. 658). They indicated that Plaintiff would likely be absent from work more than four days per month, and should only work 2 hours per day. Tr. 659. NP Hann completed a Drug and Alcohol Evaluation in May 2019, and LCSW Vitale completed another evaluation of Plaintiff's mental work limitations in June 2019. Tr. 931–32; 950–955. These evaluations were the same as the 2018 evaluation in most respects, with the biggest exception being that LCSW Vitale indicated that Plaintiff "cannot currently work." Tr. 954. The ALJ gave "little weight" to the opinions of NP Hann and LCSW Vitale because "the excessive limitations contained therein are not supported by the generally benign mental status examinations (with intact cognition and memory), the routine and conservative mental health treatment course," and Plaintiff's reported daily living activities. Tr. 45–47.

*Legal Principles*

20 C.F.R. § 404.1527(a)(1) defines "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his/her] symptoms, diagnosis and prognosis, what [he/she] can still do despite impairment(s), and [his/her] physical or mental restrictions." The opinion of a treating medical source ("treating physician") is afforded "controlling weight so long as it is well-supported by medically acceptable clinical and laboratory

15

diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal punctuation omitted). However, opinions on issues reserved to the Commissioner – such as opinions that a claimant is disabled – "are not medical opinions . . ." entitled to controlling weight. 20 C.F.R. § 404.1527(d)(1).

Second Circuit precedent holds that the ALJ must follow a two-step procedure to determine the appropriate weight to assign the treating physician's opinion. *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). At step one, "the ALJ must decide whether the opinion is entitled to controlling weight." *Id*. (citing *Burgess*, 537 F.3d at 128). At step two, "if the ALJ decide[d] the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it." *Id*. In so doing, the ALJ "must explicitly consider the . . . *Burgess* factors." Id. These are: "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Bellehsen v. Comm'r of Soc. Sec.*, 851 F. App'x 283, 284 (2d Cir. 2021) (citing *Estrella*, 925 F.3d at 95–96). Unless the ALJ has "provided good reasons for its weight assignment," a reviewing Court must remand for the ALJ to comprehensively set forth its reasons." *Id*. Even so, "[i]f ... a searching review of the record assures us that the substance of the treating physician rule was not traversed, we will affirm." *Id*. (citing *Estrella*, 925 F.3d at 96).

*Application*

The ALJ's decision contains a lengthy recitation of the medical evidence in the record. Tr. 28–39. Although Plaintiff suggests that the ALJ failed to provide reasoning to

link the medical evidence with his own findings, the Court disagrees. *See* Reply, 3, Oct. 19, 2021, ECF No. 23. In fact, the ALJ's decision provides extensive reasoning to support both his findings, and his evaluation of the opinions in the record.

After reciting the evidence in chronological order, the ALJ provided a well-documented explanation of his conclusions with respect to Plaintiff's physical impairments:

> After careful consideration, the undersigned finds that the medical evidence and the record as a whole do not support a finding of disability . . . . The medical evidence falls short of demonstrating the existence of pain and limitations that are so severe that the claimant cannot perform any work on a regular and continuing basis . . . . The longitudinal record reflects longstanding complaints of neck and back pain dating back to a period when the claimant was working. [Citing imaging records at Tr. 342–353, and treatment notes from Dr. Pastor at Tr. 356–466]. An MRI performed in September 2016 revealed severe stenosis in the cervical spine . . . . At that time, the claimant described her back pain as "very manageable." . . . . An MRI performed in December 2016 revealed mild stenosis in the lumbar spine with no severe neural foraminal narrowing or nerve impingement at any level . . . . Between December 2016 and January 2017, the claimant developed right foot drop, and an EMG revealed right peroneal mononeuropathy. [Citing, *inter alia*, treatment notes from neurologist Dr. Eugene Tolomeo, Tr. 322–341]. The record documents resolution of this issue. [Citing Tr. 728–734; *see esp.* 733]. In March 2017, the claimant developed right shoulder pain after a fall down stairs while sleepwalking . . . . X-rays showed primary osteoarthritis of the right acromioclavicular joint, and an MRI revealed a partial tear of the supraspinatus tendon. [Citing Tr. 536–541]. The combination of these ailments and symptoms were treated in a limited and conservative manner with injections and physical therapy. [Citing imaging records, and treatment notes from Dr. Pastor and Dr. Capicotto's office]. In September 2017, the claimant underwent cervical surgery with fusion of C4-C7 due to worsening neck symptoms . . . . Post-operative follow-up notes document improvement following surgical repair. Specifically, the claimant reported resolution of radicular arm pain and normal strength, sensation and reflexes were noted during multiple examinations. [Citing Dr. Capicotto's post-surgery treatment notes, Tr. 547–562]. During a visit in February 2018, the claimant denied significant neck pain or radicular arm pain. She had not yet begun a post-operative physical therapy program due to lack of transportation . . . . During a post-operative follow-up in May 2018, the claimant reported ongoing pain between her

shoulder blades. Range of motion in her neck was only mildly decreased except with regard to lateral rotation on the left, which was moderately decreased. No neurological deficits were noted on examination. Strength was assessed as 5/5 throughout. Sensation was intact. X-rays showed good positioning of surgical hardware and alignment of the fusion. She acknowledged that she had not completed a full course of physical therapy. [Citing Dr. Capicotto's office treatment notes at Tr. 654–656]. In October 2018, the claimant cited increased lumbar complaints; however, on examination, she was non-tender to palpation over the lumbar spine and bilateral sacroiliac joints. She could bend to touch her knees, exhibited a reciprocal gait, and was able to heel and toe walk. She was again encouraged to attend physical therapy. [Citing Tr. 728–734]. During an examination performed in January 2019, the claimant continued to deny radicular pain. No weakness or other deficits were detected on neurological exam. Straight leg raising was negative, and she remained able to heel walk. Cervical imaging continued to show good union of cervical spine fusion with post-operative changes and recess encroachment at C3-C4. Lumbar imaging showed annular bulging and advanced facet arthropathy at L5-Sl but no lumbar spinal stenosis. Her doctor recommended she stop smoking and consider facet block injections for pain management. [Citing Tr. 728–734]. Overall, neurological examinations do not reflect consistent substantial deficits beyond those afforded by the residual functional capacity contained in this decision. The medical record reflects improvement since cervical spine surgery and minimal and conservative treatment of lumbar and right shoulder symptoms. The claimant underwent physical therapy for neck symptoms, with some improvement. There is little physical therapy treatment in the record for other orthopedic problems. Though the claimant complains of symptoms in her hands, the record indicates, with some exceptions, largely intact sensation and grip strength . . . . Overall, the medical evidence of record does not support the degree of physical limitations alleged by the claimant.

Tr. 41–42.

In addition, the ALJ fully explained – with citations to the record – the conclusions

he drew regarding Plaintiff's mental impairments:

Similarly, the claimant's alleged mental limitations are also inconsistent with the treatment record. The record reflects that following a two-part initial intake assessment, the claimant attended eleven counseling sessions with her counselor between June 2017 and May 2019 and three medication management sessions with a psychiatric nurse practitioner between August 2017 and May 2019. [Citing treatment notes from NP Hann and LCSW Vitale at Tr. 570–629, 642–653, 774–782]. Mental status examinations

during those visits are largely benign . . . . The mental health progress notes are devoid of any mention of significant emotional !ability, abnormal thought content, or impaired judgment or insight, but rather reflect exacerbations in functioning in the setting of psychosocial stressors . . . . During the period relevant to this decision, the claimant has not treated with a psychiatrist or psychologist nor has she been psychiatrically hospitalized, partially hospitalized, or required emergent treatment for her mental health symptoms. The record reflects that she tried psychotropic medication, with good effect with compliance . . . . At hearing, she testified that she is not presently taking any psychotropic medications . . . . Overall, the medical evidence of record does not support the degree of mental limitations alleged by the claimant.

Tr. 42–43.

In the context of the foregoing explanations of the medical evidence, both of which are based on substantial evidence, the ALJ's decision to accord "little weight" to the opinions of each of Plaintiff's treatment sources cannot be said to be error. While the ALJ did not always explicitly consider the *Burgess* factors when assigning the treating physicians' opinions less than controlling weight, the Court nonetheless concludes that he provided sufficient "good reasons" in each instance for the weight assigned. *See, e.g., Guerra v. Saul*, 778 F. App'x 75, 77 (2d Cir. 2019) (finding no error where the ALJ's assignment of less than controlling weight was "[s]upported by ample treatment notes, physical examination findings, and [the claimant]'s testimony"). Specifically, the ALJ demonstrated that the opinions of Plaintiff's treating sources were not entitled to controlling weight because their assessments indicated limitations which were more severe than the objective evidence suggested. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (stating that the Second Circuit "defer[s] to the Commissioner's resolution of conflicting evidence.") (citation omitted). That is, the opinions were "inconsistent with the other substantial evidence in the case record." *See*

*Crowell v. Comm'r of Soc. Sec. Admin*., 705 F. App'x 34, 35 (2d Cir. 2017) (discussing *Burgess*, 537 F.3d at 128 (2d Cir. 2008), and quoting 20 C.F.R. § 404.1527(d)(2)).

Moreover, the suggestion that the ALJ accorded too much weight to the consultative examiners is similarly unwarranted. As is apparent from the ALJ's explanations, his conclusions were derived from the medical opinions to the extent that they were consistent with the medical evidence. Indeed, the only weight he expressly accords to the consultative examiners are to the *limitations* that they identify – limitations in walking, standing, and prolonged neck flexion, and in dealing with workplace stressors – that are consistent with the limitations that the ALJ observed in other parts of the record and included in his RFC. Tr. 44. There is no indication in the ALJ's decision that he weighed an opinion of a consultative examiner more favorably than Plaintiff's treating sources. Tr. 44.

<u>The ALJ's Evaluation of Plaintiff's Symptoms</u>

Lastly, Plaintiff maintains that the ALJ "applied an improper legal standard in assessing her symptoms." Pl. Mem. of Law at 34. In particular, Plaintiff states that rather than beginning with "the threshold question [for assessing symptoms] of whether the claimant demonstrated by objective medical evidence of impairment capable of causing the degree and type of pain [Plaintiff] alleges . . . . [the ALJ] proceeded directly to considering the credibility of her subjective allegations of pain." Pl. Mem. of Law at 33–34. The Commissioner challenges Plaintiff's interpretation of the ALJ's credibility analysis, and argues that because substantial evidence supports the legally sufficient subjective symptom evaluation, this Court should affirm the ALJ's decision. Def. Mem. of Law at 16. The Court finds no merit in Plaintiff's argument.

*Legal Principles*

20 C.F.R. § 404.1529(a) and § 416.929(a) govern the ALJ's evaluation of a claimant's symptoms, including pain. As the Second Circuit has stated:

> Evidence of pain is an important element in the adjudication of DIB and SSI claims, and must be thoroughly considered in calculating the RFC of a claimant. *See Lewis v. Apfel*, 62 F. Supp.2d 648, 657 (N.D.N.Y. 1999). "[S]ymptoms, including pain, will be determined to diminish [a claimant's] capacity for basic work activities to the extent that ... [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). To that end, the Commissioner has established a two-step inquiry to evaluate a claimant's contentions of pain. *See* Social Security Ruling 96–7P, 1996 WL 374186 (S.S.A.); 20 C.F.R. § 404.1529(c). First, the ALJ must determine whether the claimant suffers from a "medically determinable impairment[ ] that could reasonably be expected to produce" the pain alleged. 20 C.F.R. § 404.1529(c)(1); *see* SSR 96–7P. Second, the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's pain contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry. See 20 C.F.R. § 404.1529(c)(3)(i)–(vii); *Taylor v. Barnhart*, 83 Fed. App'x. 347, 350–51 (2d Cir. 2003) (summary order).

*Meadors v. Astrue*, 370 F. App'x 179, 183–84 (2d Cir. 2010) (footnote omitted). "An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . ." 42 U.S.C. § 423(d)(5)(A). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment." *Tejada v. Apfel*, 167 F.3d 770, 776 (2d Cir. 1999).

*Application*

The Court finds no error in the ALJ's assessment of Plaintiff's subjective complaints. An ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony

in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). As cited at length above, the ALJ went into great detail about the medical evidence in the record, and provided a very thorough explanation of the conclusions that he reached on the basis of that evidence. Tr. 41–43. Therefore, the ALJ did not commit error or abuse his discretion when, after his thorough explanation, and after observing that Plaintiff herself testified that "she handles her own personal care with some adaptions, prepares simple meals, and performs household chores," the ALJ inferred that "the medical evidence of record does not support the degree of physical limitations alleged by the claimant," (Tr. 42) and that "the medical evidence of record does not support the degree of mental limitations alleged by the claimant" (Tr. 43).

CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Plaintiff's motion for judgment on the pleadings [ECF No. 18] is denied, and the Commissioner's motion for judgment on the pleadings [ECF No. 21] is granted. The Clerk is directed to close this case.

SO ORDERED.

DATED:      March 31, 2022
            Rochester, New York

CHARLES J. SIRAGUSA
United States District Judge